724 So.2d 1276 (1998)
STATE of Louisiana
v.
Teddy CHESTER.
No. 97-KA-2790
Supreme Court of Louisiana.
December 1, 1998.
Opinions Granting Rehearing in Part and Dissenting from Denial of Rehearing January 15, 1999.
*1279 Nicholas J. Trenticosta, John H. Holdridge, New Orleans, for Applicant.
Richard P. Ieyoub, Atty. Gen., Paul D. Connick, Jr., Dist. Atty., Michael J. Reynolds, Covington, Terry M. Boudreaux, Gretna, Rebecca J. Becker, for Respondent.
MARCUS, Justice.[*]
Teddy Chester was indicted for the first degree murder of John Adams in violation of La. R.S. 14:30.[1] After trial by jury, defendant was found guilty as charged. A sentencing hearing was conducted before the same jury that determined the issue of guilt. The jury unanimously determined that a sentence of death be imposed on defendant. The trial judge sentenced defendant to death in accordance with the determination of the jury.
On appeal, defendant relies upon one hundred fifty-two assignments of error for reversal of his conviction and sentence.[2]

FACTS
At 4:03 a.m. on December 27, 1995, John Adams, a cab driver, was dispatched by his company, King Cab, to 713 Calhoun Street in Jefferson Parish. Later that morning, the Jefferson Parish Sheriff's Office received a call that an abandoned vehicle with doors open and lights on was at that location. A deputy that arrived at the scene around 6:20 a.m. found the cab against a fence with the driver's door open and the back door ajar on the driver's side. John Adams was found inside the cab in the driver's seat with his head tilted toward the back seat. He had been shot once in the back of the head at point blank range. A pool of blood was visible on the back floorboard behind Adams. There was blood spatter in the front passenger side and blood on the back door frame, door sill and back seat headrest on the driver's side. No blood was found on the back passenger side of the vehicle. The victim's business cards were scattered on the floorboard of the front seat. $34.64 was found in Adam's front pocket and $260.00 was found in his wallet in his right back pocket. A white plastic bag which contained a Guess shirt hung from the door handle of the back driver's side door. A pouch which Adams usually wore around his neck in which he kept his rent money and money to make change was missing.
During the subsequent investigation of the murder, the police discovered the fingerprints of Elbert Ratcliff on some of the victim's business cards. The police arrested Ratcliff on March 6, 1996. A search of his residence revealed no evidence. Based on *1280 statements given to the police by Ratcliff, information was then disseminated to law enforcement officials that Chester was wanted for questioning regarding the murder of John Adams.
On March 18, 1996, the police received a disturbance call from a female later identified as Kaprice Pollard who reported that her sister's boyfriend refused to leave her apartment. She also told police that the man had been involved in a recent homicide. When the deputy arrived, he met outside the apartment with Kaprice and her sister, Quinice Pollard. Kaprice stated that the man inside the bedroom of the apartment was Teddy Chester, Quinice's boyfriend, and that he was involved in the recent homicide of a cab driver. As the officer entered the apartment he saw someone from the waist down jumping out of the bedroom window. Chester was apprehended and arrested shortly thereafter.
Quinice Pollard told police that Chester came to see her during the night of December 27, 1995 (the date of Adam's murder), and told her that he and Ratcliff were involved in a robbery and that Ratcliff had shot the victim. Later, when she was doing Chester's laundry, she noticed blood stains on his pants. When she questioned Chester, he replied that he had been in a fight. Kaprice Pollard told the police that Chester came to her apartment on the night of Adam's murder and took her sister into the bathroom to talk. She listened at the door and overheard Chester tell Quinice that he shot a cab driver.
Based on these conversations and while Chester was being held at the police station, Detective Sacks obtained a warrant to search the house where Chester's sister lived and where he sometimes stayed. Pursuant to the search, the police seized a Raiders baseball cap with blood stains on it and a pair of jeans. A DNA analysis later determined that both the victim and Chester could not be excluded as sources of the blood found on the cap.
After execution of the search warrant, Chester was advised of his rights and interviewed by Detective Sacks. He gave two statements. In the first statement, he related that on December 27, 1995, he met up with Ratcliff who wished to sell or trade a Guess shirt in a plastic bag for money or crack cocaine. Then Chester walked down the street until he saw Adams' cab. He entered the back seat of the cab on the passenger side and asked Adams if he wanted to buy some crack. Adams replied no and Chester got out of the cab. Chester stated that he saw Ratcliff flag down the cab, enter the back seat on the driver's side and hold a revolver to Adams' head. After a brief struggle, Ratcliff pulled the cab's radio out and then shot Adams in the head. While Chester hid behind a tree, Ratcliff exited the back seat and opened the driver's door. Chester further stated that Ratcliff threatened to kill him if he told anyone.
After this first statement, Detective Sacks told Chester about evidence from the crime scene and about the baseball cap with blood stains on it that had been seized from his sister's house. Chester then gave a second statement in which he admitted he was in the cab when Adams was shot. This time he stated he entered the back seat on the passenger side, keeping one leg out of the cab on the ground. He stated that Ratcliff entered the cab on the back seat driver's side. Chester asked Adams if he wanted to buy any drugs and the victim said no. He would have sold him a fake rock of cocaine that he had in his possession. Ratcliff then asked Adams if he wanted to buy anything and Adams replied that he did not do anything like that. Ratcliff then told Adams, "well, Mother Fucker give it up" and placed a revolver to the back of Adams' head whereupon Adams said, "ohh, lord not this, not this. Oh lord not this." Ratcliff pulled out the cab radio and shot Adams. Chester then noticed blood splattered on him. The cab which had been moving forward hit a pole and stopped. Chester exited the cab from the driver's side and ran behind a tree. After Ratcliff threatened Chester not to tell anyone, the two men split up.
At trial, the state presented a DNA analysis of the blood found on Chester's cap and the blood found in the cab. Witnesses for the state testified that a great deal of blood spatter was found in the cab on and around the back seat of the driver's side, but no *1281 blood was found on the back passenger side of the cab. According to a witness for the state, when a victim is shot in the back of the head from behind, the blood spatter blows back in the direction from which the shot was fired. The state contended that Chester was the trigger puller and was in the back seat of the driver's side, not the passenger side, because no blood was found on the back passenger side and Chester's clothes and cap revealed evidence of blood.
The jury also heard testimony from Quinice and Kaprice Pollard. Quinice testified that she initially told the police that Chester had told her Ratcliff shot the cab driver; however, she changed her testimony two weeks before trial to state that Chester confessed to her on the night of the murder that he had killed a cab driver during a robbery. She stated that she changed her testimony because her conscience bothered her. When she was questioned by defense counsel why she initially told police that Ratcliff killed Adams, she stated she was afraid of Chester and he told her to say these things. The state introduced portions of letters which Quinice received from defendant while he was incarcerated and awaiting trial. In the letters, Chester urged Quinice to change her testimony and to convince her sister to do so also or not come to court. One of the letters contained a threat to Quinice that he could still get to her even from prison.
Kaprice Pollard's testimony at trial was similar to that of her initial statement to police that on the night of the murder she overheard Chester tell her sister in the bathroom of her apartment that he had killed a cab driver. She further testified that Quinice told her later that Chester was trying to rob a cab driver and he shot him because the cab driver was trying to pull off with the drugs.
The jury found defendant guilty of first degree murder. During the penalty phase, the state presented evidence of Chester's prior convictions and victim impact evidence from the victim's mother and father. It reintroduced the evidence from the guilt phase of trial. After defendant's presentation of mitigation evidence through family members, a social worker and a forensic psychiatrist, the jury unanimously determined that defendant be sentenced to death, finding as an aggravating circumstance that Chester committed the murder during an attempted armed robbery.

PRETRIAL ISSUE

Assignment of Error No. 89
Defendant contends the trial judge erred in denying his motion to suppress his statements to the police. He argues that the state failed to prove defendant's statements were voluntary because the only officer to testify about the statements could not conclusively state whether any one else had contact with defendant in his absence. Moreover, defendant contends that Detective Sacks talked to him while the tape recorder was turned off.
Before a confession may be introduced into evidence, the state must prove beyond a reasonable doubt that the statement was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. State v. Cousan, 94-2503 (La.11/25/96), 684 So.2d 382; La. R.S. 15:451; La.Code Crim. P. art. 703(D). The trial judge's conclusion on the credibility and weight of testimony relating to the voluntariness of a confession for the purpose of admissibility will not be overturned on appeal unless it is not supported by the evidence. State v. Jackson, 381 So.2d 485 (La.1980).
At the suppression hearing, Detective Sacks testified that defendant was arrested and brought to the police station around 11:00 a.m. Defendant's handcuffs were removed and he was placed in an interview room by himself. Detective Sacks requested that no one interview defendant until he returned from executing a search warrant at defendant's sister's house. When Detective Sacks returned, he advised defendant of his constitutional rights and read verbatim a waiver of rights form to defendant which defendant signed after stating that he understood his rights. Detective Sacks testified that he did not threaten, coerce, intimidate or promise defendant anything. After questioning defendant for about forty minutes, the detective turned on a tape recorder and taped defendant's first statement. The first *1282 statement began at 4:22 p.m. and ended at 4:39 p.m. In the first statement, defendant stated that he saw Ratcliff shoot Adams but denied being in the cab during the shooting.
After the first statement was completed, Detective Sacks confronted defendant with Ratcliff's statements placing defendant in the cab as the shooter and with the cap with the blood spatter on it that had been seized in the execution of the search warrant by him. Defendant changed his statement to admit he was in the cab during the shooting but insisted that Ratcliff shot Adams. After going over the waiver of rights form again but not executing a new one, Detective Sacks turned on the tape recorder at 5:11 p.m. and recorded defendant's second statement. Detective Sacks testified that Detective Thornton, his supervisor, entered the room during the interrogation and may have asked a few questions. Detective Sacks offered defendant something to eat and drink and use of the bathroom facilities during the interview. He did not leave the interview room once questioning began. After hearing this evidence, the trial judge denied the motion to suppress.
Our review of the record supports the decision of the trial judge. Defendant has not alleged nor do we find that he confessed as the result of force, coercion, threats, or promises. He was not restrained, he was offered something to eat and drink and use of the bathroom facilities. Defendant has not made any specific allegation of police misconduct during Detective Sacks' absence from the interview room. Hence, we find defendant was not prejudiced by Detective Sacks' inability to prove that no other officers contacted defendant in his absence while executing the search warrant. Moreover, we find no merit to defendant's claim that the decision not to record the interview in its entirety violated his due process rights or somehow tainted the recorded statements. Defendant has not suffered any prejudice because only the recorded statements were used at trial.
This assignment of error is without merit.

VOIR DIRE ISSUES

Assignment of Error No. 88
Defendant contends that the trial judge erred by allowing the victim's mother, Mrs. Adams, a subpoenaed witness, to stay in the courtroom during voir dire over defendant's objection. He further argues that to the extent the trial judge relied upon La. R.S. 46:1844(G)(2) and La.Code Evid. Art. 615(A), they are unconstitutional.
La. R.S. 46:1844 (G)(2) provides:
The victim, or in case of a homicide, the victim's family, shall not be excluded from any portion of any hearing or trial pertaining to the offense based on the fact that such person is subpoenaed to testify, unless, upon motion, the court determines such person's presence to be prejudicial, all to be done in conformity with applicable articles of the Louisiana Code of Evidence, especially Article 615(A)(4).
Generally, the above statute conflicts with the sequestration rule contained in La.Code Evid. art. 615(A) which states that a party or the court on its own motion shall order that witnesses be excluded from the courtroom or a place where they can see or hear the proceedings. However, article 615(A) further states that in the interest of justice, the court may exempt any witness from its order of exclusion.
The purpose of the sequestration article is to prevent witnesses from being influenced by the testimony of earlier witnesses. State v. Stewart, 387 So.2d 1103 (La.1980). Statutes are presumed valid and their constitutionality should be upheld whenever possible. State v. Hart, 96-0599 (La.1/14/97), 687 So.2d 94. The party challenging the constitutionality of the statute bears a heavy burden in proving the statute to be unconstitutional. State v. Wilson, 96-1392, 96-2076 (La.12/13/96), 685 So.2d 1063.
We find that La. R.S. 46:1844(G)(2) authorizes the victim's family to remain the courtroom during any hearing in the case including voir dire subject to the court's discretion. No error or prejudice occurred to defendant as a result of her presence in the courtroom. The record shows that Mrs. Adams had been present for each pre-trial hearing held in this case and had always conducted herself properly. Mrs. Adams was the first witness to be called by the state and she did not testify as to any circumstances *1283 surrounding the occurrence of the crime, but testified only as to the victim's background. Moreover, defendant moved and the trial judge allowed defendant's family to sit in the courtroom during voir dire, including defendant's mother, sister, brother and father. His brother testified during the guilt phase and the rest of the family testified during the penalty phase. In sum, we find no error occurred by allowing Mrs. Adams to remain in the courtroom during voir dire. Moreover, defendant fails to argue how these statutes are unconstitutional or how their application affected his rights. We find defendant has set forth no ground upon which to question their constitutionality. Hence, defendant failed to uphold his burden of proof.
This assignment of error is without merit.

Assignments of Error Nos. 1, 3, 4, 5 & 6
Defendant contends that several statements made by the trial judge to the jury were improper ex parte communications. These communications pertained to sequestration arrangements and general housekeeping rules of the court. Defendant argues that some of the communications could have conveyed to the jurors the impression that defendant was a dangerous person.
Generally, a defendant shall be present during a trial at all proceedings when the jury is present. La.Code Crim. P. art. 831(A)(5). However, this Court has held that the trial judge may address the jury outside the defendant's presence when such communication is within the bounds of a trial-related necessity. See State v. Allen, 95-1754 (La.9/5/96), 682 So.2d 713; State v. Copeland, 419 So.2d 899 (La.1982).
The record reflects that after the first nine jurors were selected, the trial judge told counsel at a bench conference that she wanted to tell the jurors where they would be sequestered "outside the presence of defendant." The trial judge then entered the jury room and discussed the sequestration, the arrangements for meals and entertainment and ascertained which jurors had belongings with them and which jurors needed to contact someone to bring their belongings. Counsel for the state and defendant were not present. In addressing the jurors the following colloquy occurred:
COURT:
I didn't want to say this out in open court because I didn't want people to know where you're staying, so it's better to tell you in the jury room. You'll be staying in a hotel in, it's 100 Westbank Expressway. What we're going to do is we're going to have, I'm going to select movies for you all to watch. We have an exercise room that's going to be set up. And then you'll be taken to dinner tonight and then you'll be given time to exercise and that sort of thing .... do you all want your belongings brought to you before dinner or after dinner?
JUROR:
I've got mine in the trunk.
COURT:
Okay.
JUROR:
The person who is going to get mine won't be at the house until later.
COURT:
All right. If you want to make a phone call, just let somebody know what's going on, that that's where you'll be staying. Ask them not to repeat that to anybody. We don't, we don't want the Press or anybody to know where you're staying, or the defendant. It's just better for you just to have some privacy; okay? So that's it. We're going to take you to lunch.
In addressing the final three jurors and two alternates, the trial judge made the following statements:
COURT:
What I'm going to tell you all is thatI've explained this to the first group, who is hereclose that door, please. You are going to be staying at a hotel on the Westbank. And I just didn't want to blurt that out in the courtroom. I think the address is, I want to tell you 100 Westbank Expressway. It's right up here.
Upon review of the judge's comments in the context of the entire colloquy, it is clear that the trial judge did not single out defendant in the jury's presence or infer that she did not want defendant to know where the jurors were staying because he was dangerous. Instead, the trial judge explained that *1284 the reason for secrecy was for the jurors' privacy and to avoid communication with people in general, the press, the jurors' families as well as defendant. We find that the emphasis on privacy rather than safety and the grouping of defendant with everyone else precludes any prejudicial result to defendant. A review of the entire colloquy shows that the complained of comments did not spark any concerns from the jurors about their safety.
In a related assignment, defendant contends it was error for the trial judge to instruct prospective jurors to name the city they were from but not their municipal address during preliminary questioning in the voir dire. Assuming his argument is that the trial judge's instruction implies defendant is a dangerous person, we find this implication not supported by the record because defendant was never mentioned in connection with the instruction. We find no error occurred as a result of this instruction.
These assignments of error are without merit.

Assignment of Error No. 8
Defendant contends the trial judge erred in denying his challenge for cause of prospective juror Helen Galloway because she was unable to follow the capital punishment scheme. He argues that Ms. Galloway indicated she would not consider mitigating circumstances and would vote for the death penalty if specific intent to commit the crime was found.
A prospective juror is properly excluded for cause because of his/her views of capital punishment when the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985); La.Code Crim. P. art. 798(2)(b). A potential juror who will not consider a life sentence and would automatically vote for the death penalty under the factual circumstances of the case before him is subject to challenge for cause by the defendant. State v. Robertson, 92-2660 (La.1/14/94), 630 So.2d 1278. A trial judge is vested with broad discretion in ruling on challenges for cause and these rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. State v. Cross, 93-1189 (La.6/30/95), 658 So.2d 683. Prejudice is presumed when a challenge for cause is denied erroneously by a trial court and the defendant has exhausted his peremptory challenges. Robertson, 630 So.2d at 1280. In this case, defendant exhausted all of his peremptory challenges.
Ms. Galloway was one of several prospective jurors who was challenged for cause by defendant.[3] During the death qualification portion of the voir dire,[4] the prosecutor asked Ms. Galloway whether she could listen to both aggravating factors and mitigating factors and in an appropriate case return a verdict of life imprisonment. She replied that she could return either life imprisonment or death. Later in the colloquy, defense counsel asked her if she had an opinion about the death penalty and what purpose it serves. She replied that she liked to think it was a deterrent, but with crime rising, she was not certain that it was. When questioned how that would bear on her decision-making process she replied that she did not know that it would. Ms. Galloway then proceeded to discuss her views on specific intent. She stated:
GALLOWAY
And so when you say specific intent and there's murder involved, I think that a society that values life so highly, that you forfeit your own when you take someone *1285 else's is the kind of society that I want to live in.
So I think the death penalty is necessary and if there are no reasonable doubts about the guilt of the person involved, that although I don't like to see anyone go through that, I think when that person made a choice with that specific intent, then they need to accept the consequences, which in this case that the State is asking for the death penalty, it would be the death penalty.
DEFENSE COUNSEL
Life would not be one of the choices?
GALLOWAY
I would listen to the evidence and the mitigating circumstances. But when you talk about specific intent, that to me says that the person killed
DEFENSE COUNSEL
Right.
GALLOWAY for the sake of killing or whatever gain it was going to profit them. And I would listen to the evidence and come back with a verdict that I felt appropriate.
...
DEFENSE COUNSEL
[C]ould you seriously consider any mitigating circumstances that I may bring forward?
GALLOWAY
I find it a contradiction between specific intent and mitigating circumstance.
At this time, defense counsel asked her to let him explain what mitigating circumstances are. Without giving him an opportunity to explain, she stated that she understood mitigating circumstances or "at least I thought I did when I sat down here." Her understanding was that there could be mitigating circumstances when an accidental death occurred or maybe when things go beyond your control, but specific intent says that the act was what you wanted to do. Instead of pursuing the relationship between mitigating circumstances and their role in a specific intent crime, defense counsel moved on to the issue of the governor's power of commutation. Ms. Galloway replied that what the Governor decides later would not have an effect on her decision. She replied:
GALLOWAY
You're asking me if I could listen to the evidence presented by both sides in this case and make a judgment based on what is presented. And that is what I will do.
Defense counsel asked Ms. Galloway if after finding defendant guilty, if she were presented with evidence that he had no prior criminal history, could she consider that factor in deciding life versus death. Her reply was, "if he's guilty of the crime, then he's guilty of the crime ... whether it's the first time or the tenth time or the twentieth time" and the penalty is "whatever it would be for the crime." Finally, defense counsel asked Ms. Galloway if defendant were proven guilty of killing someone, then should the penalty be death. She replied, "if he's proven guilty of murder with specific intent, death penalty."
After questioning the rest of the jurors, defense counsel challenged Ms. Galloway for cause on the ground that if a specific intent killing were found, her vote would be for the death penalty. The trial judge responded that she thought Ms. Galloway vacillated in her responses and she denied the challenge. Later, defendant used one of his peremptory challenges on Ms. Galloway.[5]
Viewing Ms. Galloway's responses during the entire voir dire, we find no abuse of the trial judge's discretion in refusing to grant a challenge for cause. Ms. Galloway responded to the state's questioning that she would listen to both the aggravating and mitigating circumstances and in an appropriate case return a life sentence. Later, when questioned by defense counsel, she replied that there was a contradiction between specific intent and mitigating circumstances. When defense counsel attempted to explain mitigating *1286 circumstances, she replied that she understood them; however, her responses indicated that she was confused about the application of mitigating circumstances in a specific intent crime because she thought mitigating circumstances could apply only when the crime was accidental. However, she also stated in her colloquy that she would listen to both mitigating and aggravating circumstances, and "make a judgment based on what is presented." Upon review of her entire colloquy, we do not find that Ms. Galloway expressed an unconditional willingness to impose a death penalty under any and all circumstances. In sum, we find no abuse of the trial judge's discretion in denying the defense's challenge for cause of Ms. Galloway.
This assignment of error is without merit.

GUILT PHASE ISSUES

Assignments of Error Nos. 25 & 26
Defendant contends the trial judge erred when she prohibited defense counsel from impeaching Kaprice Pollard on cross-examination with a prior juvenile adjudication and with the fact that she had an outstanding probation revocation warrant related to the adjudication when she told police about defendant's involvement in the murder of Adams. He argues that the failure to allow this information into evidence deprived him of his right to confrontation and the right to present a defense.
Generally, evidence of a witness' prior juvenile adjudication is not admissible to attack the witness' credibility under La. Code Evid. art. 609.1(F). A witness' partiality or motive may be explored at trial and is always relevant as discrediting the witness and affecting the weight of his testimony. The exposure of the witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. State v. Nash, 475 So.2d 752 (La.1985). The determination in each case is whether the defendant's confrontation rights through the cross-examination of witnesses outweigh the state's interest in keeping juvenile records confidential. State v. Hillard, 421 So.2d 220 (La.1982).
The record shows that the state filed a pre-trial "Notice to Defense of Possible Brady Material" which included information about Kaprice's juvenile adjudication and attached her rap sheet. The trial judge ordered the state to make this information available to the defense but did not rule on its admissibility pre-trial. At a bench conference held before Kaprice took the stand to testify, the prosecutor asked the trial judge if she was going to allow evidence about Kaprice's juvenile record to be admitted. The trial judge ruled that the evidence was inadmissible. Defense counsel did not attempt to impeach Kaprice on cross-examination with her juvenile adjudication or probation status. However, on re-direct, the prosecutor asked Kaprice whether she first used false names when she called the police to report the disturbance at her house involving defendant. She replied that she did but subsequently told the police their real names "after they came back and picked me up." Defense counsel then sought to re-cross the witness to explore her reference to being picked up arguing that the state had opened the door to the issue that Kaprice had been picked up on an outstanding probation revocation warrant relating to her juvenile adjudication and the information would address her credibility. The trial judge denied the request. Defendant now argues that the information could have been used to show that Kaprice made the statement implicating defendant in the murder in hopes of leniency in her own situation; hence, the information could have been used to question her motive or bias as well.
While the trial judge may have erred in prohibiting defendant from impeaching Kaprice Pollard with evidence of her prior juvenile record, the error was harmless under the circumstances. Defense counsel elicited other testimony which aided the jury's assessment of her credibility. For example, testimony was elicited from Kaprice that she lied to the police about her name and her sister's name when the police responded to the disturbance call, that she withheld knowledge of defendant's involvement in a murder for two and a half months and that she turned him in only after he created a disturbance at her house. The jury also heard that she was "picked up" which implied that Kaprice was wanted by the police. Therefore, her credibility had been placed at issue by the testimony *1287 that was elicited. Moreover, Quinice's testimony was basically the same as that of Kaprice. Hence, we find the trial judge's decision to disallow the impeachment evidence was not reversible error.
These assignments of error are without merit.

Assignments of Error Nos. 27, 28, 29, & 105
Defendant contends the trial judge erred in admitting into evidence portions of letters that he wrote to Quinice Pollard while he was in prison awaiting trial. He argues that the letters are not relevant, if they are relevant, they are more prejudicial than probative because they show his propensity to violence, that a proper foundation was not established and that admission in their redacted form was prejudicial.
La.Code Evid. art. 401 defines relevant evidence as evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Article 403 states that "although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." The trial judge determines whether evidence is relevant by deciding whether it bears a rational connection to the fact which is at issue in the case. State v. Scales, 93-2003 (La.5/22/95), 655 So.2d 1326.
During the state's direct examination of Quinice Pollard, the prosecutor elicited testimony about letters defendant wrote to her while in prison and asked her to read portions of them as follows:
P.S.: Please don't let that be a lie about you helping a nigger. Please don't. Try to have your sister change her statement, or don't come to Court and get those other Witnesses to come to Court and help a nigger. I, that nigger who really loved you for you.
Bay, see if you come to Court, say you can't remember what I told you while I was in here, they can't do you anything. But, look, if you was to come and say you can't remember anything because that was so long and say you can't remember if I was a boyfriend that you see with the gun or the other one, `ya dig,' Bay, that can help me out and then on top of it, they wouldn't want to use you anymore because you ain't saying what the D.A. want you to say. `Ya dig what I'm saying,' so at that point you would have help me out and then you will be out of this shit, `Ya know.' But that will help me out a lot because what you said was one of things they had towards me. The other is what that nigga said. That's my word toward his. The other one is the bloodbloody clothes and I told them how that happens, so after you come and say that it will be me two bads towards him. I don't know many.
Quinice also testified that during a phone call, defendant asked her to say it was somebody else she saw with a gun before the murder.
During cross-examination, defense counsel elicited from Quinice the fact that she had changed her story. Initially, she told police that Chester told her Ratcliff shot a cab driver where now she testified at trial that Chester told her that he was the shooter. When asked why she had changed her story, one of her reasons was that she was scared of defendant. Later, on re-direct, the state sought to introduce portions of another letter as follows:
You think I can't get to you? Well, you want me to send a nigga to your apartment to show you, just to let you know I can get you, if I want you, but don't want you. I don't want you die, I want you to go through every bit of hurt I went through. I want to be the one to give it to you.
First, we find that the letters are both relevant and probative because in them, defendant is asking his girlfriend to testify that she does not remember what he told her about the murder. Second, in the letters, defendant is asking his girlfriend to have her sister, Kaprice, change her story which, from the initial statement on, was that Kaprice heard defendant tell her sister that he had shot a cab driver. The last letter is probative because it reveals an attempt to intimidate the witness and persuade her not to testify. Moreover, defense counsel was given *1288 an opportunity to cross-examine the witness about the letters and elicit other meanings and other reasons from Kaprice as to why defendant was attempting to intimidate her or why he might be angry with her. Defense counsel did elicit the fact that the witness was involved with and pregnant by another man, and in closing argument defense counsel argued that defendant's threat to Quinice could be in reference to her new relationship with another man.
Defendant further argues that the letters should be inadmissible because they violated discovery rules due to the tardiness of their disclosure. The state notified the defense about the existence of the letters the day before voir dire began and turned them over as soon as they were obtained. Defense counsel filed a motion objecting to their introduction on grounds of relevancy and tardiness but the judge deferred ruling until the testimony of Quinice at which time the motion was denied. Despite the fact that the letters were received at a late date, defense counsel admitted on the record that she would not have done anything differently had she received the letters earlier. Hence, defendant is unable to show how he was prejudiced by the late disclosure of the letters.
Next, defendant alleges that the state failed to establish a foundation for the admission of the letters because the prosecutor did not ask Quinice if she recognized defendant's signature. However, because defendant failed to object to an improper foundation and because Quinice testified that she recognized the state's exhibits, this argument is without merit. State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364.
Last, defendant complains that admission of the letters in their redacted form was prejudicial to defendant. The letters were admitted in their redacted form because they contained other statements which were both prejudicial and irrelevant to the case. If any statements in the letter were in fact helpful to the defense, then defendant could have had those portions admitted into evidence but did not do so. In sum, we conclude that the introduction of the letters into evidence was not error.
These assignments of error are without merit.

SENTENCE REVIEW
Article I, section 20 of the Louisiana Constitution prohibits cruel, excessive, or unusual punishment. La.Code Crim. P. art. 905.9 provides that this Court shall review every sentence of death to determine if it is excessive. The criteria for review are established in La. Sup.Ct. R. 28, § 1, which provides:
Every sentence of death shall be reviewed by this court to determine if it is excessive. In determining whether the sentence is excessive the court shall determine:
(a) whether the sentence was imposed under the influence of passion, prejudice or any other arbitrary factors, and
(b) whether the evidence supports the jury's finding of a statutory aggravating circumstance, and
(c) whether the sentence is disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

PASSION, PREJUDICE OR ANY OTHER ARBITRARY FACTORS
There is no evidence that passion, prejudice or any other arbitrary factors influenced the jury in its determination of the death sentence for the murder of Chester Adams.

STATUTORY AGGRAVATING CIRCUMSTANCES
At trial, the state argued that two aggravating circumstances existed: (1) the offender was engaged in the perpetration or attempted perpetration of armed robbery, and (2) the offender was engaged in the attempted distribution, exchange, sale, or purchase of a controlled dangerous substance listed in schedules I, II, III, IV or V of the Uniform Controlled Dangerous Substances Law. The jury in its verdict found the following aggravating circumstance:
The offender was engaged in the attempted perpetration of an armed robbery.
We find that defendant's sentence of death is supported by the evidence presented that he was engaged in the attempted perpetration of an armed robbery when he killed Adams. Kaprice and Quinice Pollard testified *1289 that defendant came to their house on the night of the murder and told them he had been involved in a robbery of a cab driver. Quinice testified that defendant had a gun before the murder. Defendant admitted in his statements to Detective Sacks that he was trying to sell crack cocaine for some money. The victim's mother testified that her son always wore a pouch around his neck in which he kept rent money and money for making change and this item was not found at the crime scene. Business cards and other property of the victim were scattered in and around the cab.
Even if the evidence did not establish that defendant was engaged in the distribution or attempted distribution of a controlled dangerous substance, the failure of one aggravating circumstance does not invalidate a death penalty if another aggravating circumstance is supported by the record, so long as the evidence offered in support of the arguably unproved aggravating circumstance did not inject an arbitrary factor into the proceeding. State v. Martin, 93-0285 (La.10/17/94), 645 So.2d 190. The evidence that defendant was attempting to sell crack cocaine or fake crack cocaine to the victim was properly admitted and did not inject an arbitrary factor into the proceeding.

PROPORTIONALITY TO THE PENALTY IMPOSED IN SIMILAR CASES
Federal constitutional law does not require a proportionality review. Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Nonetheless, La. Sup.Ct. R. 28, § 4(b) provides that the district attorney shall file with this court a list of each first degree murder case tried after January 1, 1976, in the district in which sentence was imposed. The state's list reveals that 62 cases were tried to a jury in the Twenty-fourth Judicial District Court for the Parish of Jefferson since 1976, including defendant's case, and the imposition of the death penalty was recommended sixteen times including the instant case. Eight of the sixteen cases in which the jury returned a death sentence involved armed robbery as an aggravating factor.[6] A review of these cases as set forth in the state's sentencing report supports our finding that the death penalty imposed in this case is not disproportionate. Moreover, the fact that none of the defendants in these cases were as young as defendant in this case does not make his sentence disproportionate per se. This court has imposed death sentences for a defendant as young as seventeen years of age at the time of the offense. See State v. Craig, 95-2499 (La.5/20/97), 699 So.2d 865, State v. Comeaux, 93-2729 (La.7/1/97), 699 So.2d 16 and State v. Prejean, 379 So.2d 240 (La.1979). See also State v. Williams, 96-1023(La. 1/21/98), 708 So.2d 703 (defendant who was eighteen years of age at the time he committed murder sentenced to death). Finally, we reject defendant's argument that his sentence is disproportionate because his co-defendant, who was tried and convicted of second degree murder after him, was given a life sentence. In this case, the state contended that Ratcliff was a principal and that defendant was the shooter, and the jury found the evidence supported this conclusion.
The Uniform Capital Sentence Report in this case reveals that defendant is a black male born on November 19, 1977 (he points *1290 out in memorandum that his actual birth date is November 10). He was eighteen years old and unmarried with no children at the time the crime was committed. He is the youngest of four children with both parents living. The highest grade he completed was fifth grade. A psychologist who tested him while awaiting trial assessed his IQ at 68, mildly retarded with a mixed personality disorder, while another mental health professional found his IQ to be 91. He has never held a job longer than two weeks. A psychiatric evaluation assessed defendant with dyslexia, poor reasoning skills, aggressive behavior and poor relations with peers. The sentencing report shows that defendant pled guilty to aggravated battery in 1995 and was sentenced to five years at hard labor suspended and to one year at the Jefferson Parish Correctional Center and three years active probation. He pled guilty to resisting an officer, a misdemeanor, in 1996, and was sentenced to six months imprisonment.
Having considered the above facts, we are unable to say that the sentence of death imposed in the instant case is disproportionate to the penalty imposed in similar cases, considering both the crime and defendant. Hence, based on the above criteria, we do not consider defendant's sentence of death for the murder of John Adams to be excessive.

DECREE
For the reasons assigned, defendant's conviction and death sentence for the murder of John Adams are affirmed for all purposes, except that this judgment shall not serve as a condition precedent to execution, as provided by La. R.S. 15:567 until either (a) defendant fails to petition the United States Supreme Court timely for certiorari; or (b) that Court denies his petition for certiorari and either (i) defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules, for rehearing of denial of certiorari, or (ii) that Court denies his petition for rehearing.

ON REHEARING
PER CURIAM.
After consideration of the application for rehearing, we choose to make abundantly clear that the standard by which we determined that potential juror Galloway was not properly excludable for cause was indeed the one set forth by this Court in State v. Robertson, 92-2660 (La. 1/14/94), 630 So.2d 1278, 1284, in which we held that a potential juror is properly challenged for cause by the defendant where she "will not consider a life sentence and ... will automatically vote for the death penalty under the factual circumstances of the case before [her]." (emphasis added). The application for rehearing is otherwise denied.
CALOGERO, C.J., dissenting from denial of the rehearing.
I would grant rehearing on the issue of whether the trial court erred in failing to dismiss venirewoman Galloway for cause.
This Court has previously held that a proper basis for exclusion is the case where a juror "will not consider a life sentence and ... will automatically vote for the death penalty under the factual circumstances of the case before him." State v. Robertson, 92-2660 (La. 1/14/94), 630 So.2d 1278, 1284. If a prospective juror's inclination toward the death penalty would substantially impair the performance of the juror's duties, a challenge for cause is warranted. State v. Ross, 623 So.2d 643, 644 (La.1993).
Although Ms. Galloway initially indicated that she could consider the aggravating and mitigating circumstances in determining whether a life or death sentence should be imposed, she made it unequivocally clear that she would vote for the death penalty in the case of intentional murder. Galloway specifically stated, "If [the defendant] is proven guilty of murder with specific intent, death penalty." There was no further effort by the state or the trial court to rehabilitate this venirewoman. Although during the state's examination Ms. Galloway indicated that she could listen to the mitigating factors, and in an appropriate case return a life or death sentence, her pronouncement that the death penalty was the appropriate penalty when a person committed murder with specific intent case doubt on her ability to consider life in this case, where a conviction of first degree *1291 murder would necessarily require a finding of specific intent to kill.
NOTES
[*] Victory, J. not on panel. Rule IV, Part 2, § 3.
[1] Elbert Ratcliff was charged in the same indictment with Chester for the first degree murder of Adams. The charge against Ratcliff was severed and he was tried separately. Ratcliff was convicted of second degree murder and sentenced to life imprisonment.
[2] The assignments of error not discussed in this opinion do not represent reversible error and are governed by clearly established principles of law. They will be reviewed in an appendix which will not be published but will comprise part of the record in this case.
[3] A discussion of the assignments of error concerning challenges for cause of the other prospective jurors will be treated in the appendix.
[4] The trial judge divided the voir dire of the jurors into a death qualification portion and then a general portion. Death qualification voir dire was accomplished with nine panels of between six and seventeen prospective jurors. Those jurors who were not disqualified or excused for cause were asked to return after the Mother's Day weekend to participate in the general qualification examination which was accomplished in two panels. The jury was chosen from the jurors who participated in the general qualification venire. If a juror was not excused for cause after the general qualification examination, then the state or the defendant had to exercise their peremptory challenges.
[5] On appeal, defendant also argues that Ms. Galloway's relationship with the state's investigator constituted a proper basis for granting his challenge for cause. When Ms. Galloway was asked if she knew anyone connected with the case, she replied that she knew the state's investigator, Lisa Hughes, for nearly twenty years, and although she had great respect for her and her family, she thought she could be fair and impartial. Thus, it did not appear that the relationship would influence her decision in the case. The defense did not challenge her for cause on this issue during voir dire.
[6] State v. Berry, 391 So.2d 406 (La. 1980), cert denied, 451 U.S. 1010, 101 S.Ct. 2347, 68 L.Ed.2d 863, (1981)(defendant fatally shot law enforcement officer during a bank robbery); State v. Lindsey, 543 So.2d 886 (La. 1989); cert denied, 494 U.S. 1074, 110 S.Ct. 1796, 108 L.Ed.2d 798 (1990)(defendant killed a shopper in a mall parking lot); State v. Robinson, 421 So.2d 229 (La.1982)(defendant killed husband of an apartment complex manager in her presence during an armed robberythis court affirmed the conviction but vacated the death sentence and on remand defendant was given a life sentence); State v. Taylor, 422 So.2d 109 (La. 1982), cert denied, 460 U.S. 1103, 103 S.Ct. 1803, 76 L.Ed.2d 367 (1983)(defendant stabbed to death victim who he had lured into a shopping center parking lot on the pretext of wanting to buy the victim's car); State v. Seals, 95-0305 (La. 11/25/96), 684 So.2d 368, cert denied, 520 U.S. 1199, 117 S.Ct. 1558, 137 L.Ed.2d 705 (1997)(defendant fatally shot a cab driver and stole his cab); State v. Ball, Docket No. 96-4222, Div. "C" (appeal not yet filed in this court)(defendant shot and killed a delivery man who attempted to stop an armed robbery in progress of a bar owner and employee); State v. Lucky, 96-1687 (appeal pending in this court)(defendant shot two of his co-workers, killing one of them during an armed robbery). The eighth one is that of defendant in this case.