831 So.2d 862 (2002)
STATE of Louisiana
v.
James DUNN.
No. 2001-KA-1635.
Supreme Court of Louisiana.
November 1, 2002.
*864 Frederick Kroenke, Jr., Baton Rouge, Denise LeBoeuf, New Orleans, for Applicant.
Richard P. Ieyoub, Attorney General, Robert Rick Bryant, District Attorney, Donald D. Candell, Robert C. O'Bannon, Anthony G. Falterman, Gonzales, for Respondent.
Mark D. MacNamara, Counsel for American Association of Mental Retardation (Amicus Curiae)
WEIMER, Justice.
This matter involves a direct appeal to this court from a conviction of two counts of first-degree murder and a sentence of death for each count. LSA-Const. art. V, § 5(D).
On March 18, 1999, after three days of voir dire and a four-day trial, a Calcasieu Parish[1] jury found the defendant guilty of *865 the first degree murders of Jacqueline Guillot Blanchard and Lisa Ann Dupuis. During the penalty phase of the trial, the jury found two aggravating circumstances: 1) the offender was engaged in the perpetration or attempted perpetration of an armed robbery; and, 2) the offender knowingly created a risk of death or great bodily harm to more than one person. The defendant was sentenced to death on each count.
Defendant now perfects this appeal based on six assignments of error. For reasons that follow, we affirm defendant's conviction and remand the matter for a hearing to determine whether defendant is mentally retarded[2] such that he is exempt from the death penalty as mandated by the decision rendered by the United States Supreme Court in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

FACTS
On June 4, 1998, the defendant borrowed a rental car from his girlfriend Leola Steward and picked up Kendall Breaux and Anthony Scott in Garyville, Louisiana. The three then went to Napoleonville. The defendant drove past the Iberville Bank to a convenience store where the trio purchased soft drinks. They then returned to the bank shortly before noon. Defendant parked the car in a handicapped parking space, and he and Scott entered the bank. There were two employees in the bank at the time. Lisa Dupuis, age 22, was behind the teller counter and 31-year-old Jacqueline Blanchard was seated at a desk near the front door. The bank surveillance camera documented the defendant and Scott entering the bank at approximately 11:40 a.m. The tape shows Ms. Dupuis conducting a written transaction for the defendant. While she filled out the document, defendant left the bank and walked back to the car where Breaux was waiting. Defendant handed Breaux a pager and instructed him to enter the bank in 30 seconds. Defendant then walked back into the bank and aimed a 9mm handgun at Ms. Dupuis.
There were no other eyewitnesses in the bank at the time, but the bank's surveillance camera captured the initial stages of the robbery as it unfolded. As soon as he re-entered the bank, the defendant pulled out a 9mm handgun and aimed it at Ms. Dupuis. At the same time, Scott pulled out a large revolver and aimed it at Ms. Blanchard. While Scott forced Ms. Blanchard to stand, defendant vaulted over the customer counter and grabbed Ms. Dupuis from behind. Scott forced Ms. Blanchard to walk to the teller area where Dunn was holding Ms. Dupuis at gunpoint. The two men began removing money from the cash drawers while still pointing their weapons at the women. Scott and the defendant then forced both women into a side office. Although there were no video cameras in the office, the lobby camera photographed some of this activity. Breaux then entered the bank carrying a Prestone Anti-Freeze container filled with gasoline and began to douse the bank lobby with it. Ms. Blanchard appeared to be praying, while Ms. Dupuis stood behind her. At that point, the video equipment *866 was pulled from the wall, interrupting the recording.
A bank customer, Earline Simoneaux, arrived at the drive-up teller window at the same time and noticed that the blinds were drawn, but the slats were open. She peered through the slats and saw two black males running out of the side office. Ms. Simoneaux testified that just as she started to ring the teller call button and just after the two black males bolted through the front door of the bank, she heard a gunshot, and then moments later, two more gunshots. She then saw a black male wearing a white cap run out of the office. He glanced back at her as he ran. Ms. Simoneaux then drove to the side of the bank where she saw a green Pontiac Sunfire drive out of the parking lot. She attempted to follow the car, but once the police arrived, she returned to report what she had seen. Ms. Simoneaux was certain that the defendant, who was wearing a white hat, had been the perpetrator. He was the one who had fired the shots after the other two black males had left the bank.
Assumption Parish Sheriff's Deputy Michael Brown responded to the bank alarm. As he drove towards the bank he saw a green Pontiac exit the parking lot. Expecting a false alarm, he approached the front door, opened it, and noticed a strong odor of gasoline. He did not see the tellers so he announced his presence. He got no response, but heard a gurgling sound coming from the side office. As he approached he saw Jacqueline Guillot Blanchard lying face down in a pool of blood gasping for breath. He saw Lisa Dupuis' legs, and looked behind the teller counter and saw her lying in a pool of blood as well. He ran back outside to call for additional officers and an ambulance. He re-entered the bank and noticed Ms. Blanchard attempting to breathe. He checked Ms. Dupuis for a pulse and determined that she was dead.
Ms. Blanchard was moved to the lobby when the ambulance arrived. She died on the way to the hospital. Further investigation revealed that both women were shot multiple times in the head and upper body. Bullets and empty casings that matched the defendant's 9mm weapon were found under and around the victims' bodies. Police found gasoline on Ms. Blanchard's desk, the teller counter, and in areas inside the office. The video equipment along with a total of $16,615.00 in cash was missing from the bank.
Ms. Simoneaux returned to the bank and gave police a description of the car and the defendants. At that point police put up roadblocks throughout the parish. Two deputies attempted to stop a vehicle fitting the description at a roadblock in Ascension Parish. The defendants drove through the roadblock at high speed. As they rounded a curve, the vehicle, driven by the defendant, drove directly into a train which was passing on nearby railroad tracks perpendicular to the highway. Uninjured, the defendant and Scott jumped out of the front of the car and fled. A foot chase ensued.
Kendall Breaux exited the back seat of the car and attempted to run away but was captured by police at the scene of the crash. Defendant and Scott were captured in a sugar cane field about two miles away. All of the money, the video equipment and both weapons were found. Some items were found in the vehicle while other items were found in the cane field where Scott and defendant were hiding.

PRE-TRIAL ISSUES

ARGUMENT NO. 1

(Assignment of Error No. 2)
In his second assignment of error, the defendant claims that the trial court erroneously *867 abridged his right to present a defense. Specifically, defendant argues that the court erred by granting the state's motion in limine to exclude the introduction of actions and statements of the co-defendants before and after the murder to demonstrate that the defendant was a follower and not a leader. Defendant argues that the statements made by Breaux are not hearsay under LSA-C.E. art. 801(D)(3)(b) because they were made in furtherance of a conspiracy and during the continuation of the conspiracy.
Although appellate counsel argues that evidence of statements made by Breaux and Scott was admissible under the co-conspirator hearsay exception in LSA-C.E. art. 801(D)(3)(b), the trial transcript shows that defense counsel sought only to establish from police witnesses that the co-defendants had given statements completely at odds with what the bank surveillance tape depicted of their actions at the time of the robbery. Counsel did not seek to introduce any details of those statements and informed the court that he would call other witnesses to establish that Breaux had been the instigator of the plan to rob the Iberville Bank.[3] The trial court agreed with the State that the co-defendants were not on trial and that if neither Breaux nor Scott appeared to testify, the court would "not allow the defense to make any reference to any statements that they may have made."
In the context in which it was made, the trial court's ruling does not reflect an abuse of its broad discretion in determining the relevancy of evidence. Whether the co-defendants gave post-arrest statements in which they attempted to minimize their own roles in the robbery had no bearing on the defendant's culpability for his own acts inside the bank. Moreover, to the extent that the co-defendants attempted to shift blame to the defendant, their post-arrest statements were presumptively unreliable. Lee v. Illinois, 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986). Any opinion as to whether the statements matched what was depicted on the bank surveillance tape, in support of a defense at the guilt stage that the defendant was merely a follower and not the leader in the conspiracy, was irrelevant because the defense had no validity under Louisiana law. Even outright compulsion of another under the threat of death does not justify or excuse commission of a homicide. LSA-R.S. 14:18(6). The proposed testimony thus risked diverting the jury's attention and confusing the issues at the guilt stage and was properly excluded by the court. "A trial judge's determination regarding the relevancy of offered testimony is entitled to great weight and should not be overturned absent a clear abuse of *868 discretion." State v. Stramiello, 392 So.2d 425, 428 (La.1980).
Appellate counsel complains that the State "sucker punched" the defense by allowing it to inform jurors during its opening remarks that it would show Breaux was the mastermind behind the bank robbery and then made its motion in limine to cut the heart out of that defense. The loss to the defense during the guilt stage was minimal. During the trial, jurors viewed the bank surveillance tape and could see for themselves defendant pulling out his 9mm and vaulting over the counter to confront Ms. Dupuis. Jurors also had to judge for themselves the credibility of Ms. Simoneaux's testimony that the other two perpetrators had just reached the outside of the bank when the shots rang out from the inside office. Defendant, wearing a white cap, then exited the bank. The distinguishing element between first and second degree felony murder turned on whether jurors believed Ms. Simoneaux's identification of the defendant as the white-capped shooter, not on the question of who instigated and led the bank robbery.
The relative culpability of the three men was relevant during the penalty phase when jurors were charged by law to consider whether the defendant committed the offense while "under the influence or under the domination of another person." LSA-C.Cr.P. art. 905.5(c). Appellate counsel again fails to show how Breaux's attempts to minimize his own role in the offense to the police after his arrest had any probative value on the question of whether he masterminded the crime and took advantage of the defendant's alleged limited mental capacity to ensnare him in the offense. Appellate counsel fails to show how the statements would have advanced the penalty phase defense that the defendant was a mere follower, not a leader, in the offense.
Appellate counsel can show no prejudice from the trial court's ruling regarding Breaux's pre-arrest statements. At the close of the defense case during the guilt phase, counsel called Olivia Mazique, the defendant's girlfriend and mother of his child, to testify. Counsel sought to establish the nature of the relationship between the defendant and Breaux; however, a controversy ensued over whether Ms. Mazique had violated the court's sequestration order disqualifying her from testifying. In a proffer outside the jury's presence, Ms. Mazique testified that in the weeks before the robbery, while she and the defendant were sleeping, Breaux would tap on the bedroom window, summoning the defendant outside. The defendant would leave, speak with Breaux outside for "[n]o more than a minute," and then return to bed. She stated that she never heard any of the conversations between the defendant and Breaux.
Given Ms. Mazique's testimony that she never overheard any of the conversations between the two men, the trial court's exclusion of any testimony as to those conversations clearly did no harm to the defense at either stage of the trial. The record clearly shows that the court saw no relevance to the testimony and excluded it on those grounds. The trial court correctly ruled that the witness simply was not in a position to testify as to who was the leader and who was the follower in those conversations.
Ms. Mazique appeared as a defense witness during the penalty phase and made a plea for the defendant's life, describing him as a compassionate, caring, and loving man, a portrait she conceded was wholly at odds with what the jury knew of him from the bank robbery. Although unsuccessful in sparing the defendant's *869 life, her testimony far outweighed the loss of any testimony with regard to whether defendant was the leader based on those fleeting, early morning conversations she did not hear.
Under the circumstances of this case, we find no abuse in the trial court's determination to exclude introduction of actions and statements of the co-defendants who did not testify at defendant's trial.[4]
This assignment lacks merit.

VOIR DIRE ISSUES

ARGUMENT NO. 2

(Assignment of Error No. 1)
In his first assignment of error, the defendant claims that the trial court erred by denying his peremptory challenge of venire member Anderson on the basis that it was improperly motivated by discriminatory intent.
In Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court held that an equal protection violation occurs if a party exercises a peremptory challenge to exclude a prospective juror on the basis of a person's race. See also, LSA-C.Cr.P. art. 795. If the challenger makes a prima facie showing of discriminatory strikes, the burden shifts to the opposing party to offer racially-neutral explanations for the challenged members. The neutral explanation must be one which is clear, reasonably specific, legitimate, and related to the particular case at bar. State v. Collier, 553 So.2d 815, 820 (La.1989). If the race-neutral explanation is tendered, the trial court must decide, in step three of the Batson analysis, whether the challenger has proven purposeful discrimination. Purkett v. Elem, 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). A reviewing court owes the district judge's evaluations of discriminatory intent great deference and should not reverse them unless they are clearly erroneous. Hernandez v. New York, 500 U.S. 352, 364, 111 S.Ct. 1859, 1868, 114 L.Ed.2d 395 (1991); Batson, 476 U.S. at 98, n. 21, 106 S.Ct. at 1724.
The equal protection rights of prospective jurors were given an added measure of protection in Georgia v. McCollum, 505 U.S. 42, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), which held that a criminal defendant may not use peremptory challenges in a racially discriminatory manner to exclude jurors from his jury. McCollum involved white defendant's striking black venire persons. In State v. Knox, 609 So.2d 803 (La.1992), this court interpreted McCollum to apply to black criminal defendants and held that McCollum prohibits them from exercising their peremptory challenges to exclude white jurors from the jury. The ultimate burden of persuasion remains on the party raising the challenge to prove purposeful discrimination. Purkett v. Elem, 514 U.S. at 768, 115 S.Ct. at 1771.
The State initiated its first reverse-Batson objection after the defense peremptorily challenged venire member Messenger. The State's reasoning was that counsel had, at that point in time, challenged eight potential jurors, all of whom had been white. The court heard argument from the State and defense as to seven of the challenged jurors and determined that the defense had provided race-neutral reasons for the peremptory challenges of venire members Hudson, Clark, Leleux, Williams, Perrin, Alexander, and Messenger. Counsel for defendant were unable to provide reasons for the first two challenges to *870 venire members Wright and Whitley at that time because their notes as to the first panel were not in the court room. Challenges for Wright and Whitley were to be reviewed the following day.
The jury selection process continued and several prospective jurors were consideredone was accepted while others were excused. The next prospective juror to be considered was Anderson. The State accepted him; however, the defense exercised a peremptory challenge excusing Mr. Anderson. The following exchange occurred:
STATE: Again, we request that it's a continuing Batson challenge at this point.
DEFENSE: I would be glad. Let's clear them while we're here.
COURT: Okay.
DEFENSE: Mr. Anderson not only said that he favors the death penalty, but in fact he
 favors the death penalty in most circumstances. I feel that he's more than
 ready to vote for death. I had a few challenges left, I chose not to have
 him on my jury.
STATE: Your Honor, this guy is Catholic, and his religionhis religious organization
 believes that the death penalty is wrong. He said that he can vote for
 death, but he wouldn't automatically do so, that he would consider
 mitigating circumstances, and it just depends on the situation. I don't
 think Mr. Anderson said or did anything that would indicate that he would
 be anything but a fair and impartial juror, and I believe he's excluded
 based on race.
DEFENSE: Can I make one more comment? Mr. Nolting has some notes I didn't
 have. Mr. Nolting's notes also reflect that heand I forgot, I didn't write
 this down, I had very limited spacebut that the situations that it was not
 warranted inthe death penalty was not warrantedwould be in the
 mercy killing. That he could give the death penalty in a situation where
 there was a violent death.
NOLTING: (Defense Counsel) He said in this situation.
DEFENSE: In this situation. That he has no problem giving the death penalty let's
 say in this situation.
NOLTING: In this case.
* * * *
COURT: Well, that's not the criteria. I remember this particular juror's response,
 as I went through that clearly with him. I don't see anywhere in there
 where this individual would refuse to look at all the circumstances and
 consider any lesser included offense so far as this particular charge is
 concerned. I don't see anything in his responses, in totality, so far as the
 penalty phase is concerned, that he would not consider all mitigating
 circumstances and aggravating circumstances. Your argument so far as a
 race neutral reason under Batson, when considering the argument of the
 State, your argument and the responses of Mr. Anderson, I do not find
 that you stated a race neutral reason for Mr. Anderson. Therefore, Mr.
 Anderson will be Juror No. 6.
*871 Article I, Section 17 of the Louisiana Constitution grants an accused the right to a full and complete voir dire examination and to the exercise of peremptory challenges. The exercise of peremptory challenges must be race neutral and is governed by the rulings of the court in Batson and its progeny.
In State v. Tyler, 97-0338 (La.9/9/98),723 So.2d 939, this court held that the evidence supported the judge's finding that racial discrimination motivated defendant's peremptory challenges of two jurors and that the race-neutral explanation of jurors' leanings toward the death penalty was a pretext for discrimination in a first-degree murder prosecution. Specifically, the court found that the voir dire responses of jurors showed that their attitudes toward capital punishment fell far short of justifying a cause challenge and the race-neutral reason offered for excluding them could be viewed as a pretext for discrimination. The jurors had expressed willingness to consider a life sentence depending on evidence and mitigating circumstances. Thus, the court found that purposeful discrimination motivated the peremptory challenges.
During voir dire examination of the panel, the following colloquy occurred between the court and prospective juror Anderson:
COURT: In regards to the death penalty, you said you're in favor of the death
 penalty?
ANDERSON: In most circumstances, yes.
COURT: Do you have any general opposition to the death penalty?
ANDERSON: Yes.
COURT: You have opposition to the imposition?
ANDERSON: I don't think I could do that in something like a violentlike a mercy
 killing or you know, something like that, I don't think that would be
 warranted.
COURT: Well, what I'm asking you is this. If you were selected as a juror in this
 case, would your makeup, knowing you, do you feel that you would be
 against the death penalty?
ANDERSON: Not in this situation.
COURT: I'm sorry?
ANDERSON: In this situation, I don't think I would be against it.
COURT: Now, you said not in this situation?
ANDERSON: In this situation, I could go byI could see the death penalty.
COURT: Now, I'm going to walk this line real carefully. Have you heard anything
 about this case, other than what's been mentioned in this courtroom?
 Don't tell me if you have heard anything.
ANDERSON: No, I haven't heard anything other than what's been in here.
* * * *
*872
ANDERSON: But, like they said, there were some graphic pictures and it sounded
 violent to me.
COURT: Okay. Have you formed an opinion already on this case?
ANDERSON: No.
COURT: Okay. Would you keep an open mind prior to making any decision?
ANDERSON: Yes.
COURT: So, would you automatically vote to impose the death penalty?
ANDERSON: No, sir.
COURT: Would you consider all of the mitigating circumstances and the aggravating
 circumstances during the penalty phase, prior to making a decision as
 to death by lethal injection or life imprisonment without benefit of
 probation, parole or suspension of sentence?
ANDERSON: Yes.
COURT: Would you give more weight to an aggravating circumstance than a
 mitigating circumstance?
ANDERSON: No.
Defense claims the race-neutral reason for striking the juror was that he was leaning toward the death penalty. The court did not agree that counsel's explanation was supported by the record. In this case, the court found Mr. Anderson's responses indicated that he could be a fair and impartial juror. Given the responses of Anderson to the questions of counsel and the court and considering the great deference afforded the trial court relative to the evaluation of discriminatory intent, we are convinced the trial court did not err in determining that counsel for defendant engaged in discrimination by exercising a peremptory challenge against Anderson. Thus, the trial court acted properly in remedying this discrimination by ordering that Anderson be made a member of the jury. See Batson and progeny.
This court will very carefully evaluate the trial court's abrogating a defendant's use of a peremptory challenge especially in a death penalty case, where the stakes are so significant. However, the law is quite clear that discriminatory use of peremptory challenges, whether by the defendant or the State, cannot be tolerated.
Review of the record established the trial court paid close attention to the responses of each potential juror and carefully and judiciously evaluated each of the Batson challenges lodged by the State and the responses of the defense. The court consciously considered each race-neutral reason given by the defense for exercising peremptory challenges. Because it is difficult to detect intent from a cold transcription of the record, the reviewing court should give great deference to the trial judge's findings since those findings largely turn on an evaluation of credibility. A review of the entire record clearly and unmistakenly demonstrates the trial court did not err.
During oral argument before this court, counsel for defendant claims the *873 trial court never expressly made a ruling on the issue of the State's prima facie case of discrimination. Review of the record indicates defense counsel did not make an objection that the State failed to provide prima facie proof of discrimination but simply provided an explanation for his challenge of the prospective juror.
In State v. Green, 94-0887, p. 25 (La.5/22/95), 655 So.2d 272, 288, this court held that a trial judge's demand that the challenged party justify the use of a peremptory strike is tantamount to a finding that the challenger has produced enough evidence to support an inference of discriminatory purpose. This court cited Hernandez v. New York, 500 U.S. at 359, 111 S.Ct. at 1866, approvingly noting that once the trial court rules on the ultimate issue of intentional discrimination, the preliminary issue of whether a prima facie showing has been made is moot.
After giving this matter careful and appropriate consideration, we are convinced the decision of the trial court is not clearly erroneous. This assignment of error lacks merit.

ARGUMENT NO. 3

(Assignment of Error No. 4)
In his fourth assignment of error, the defendant claims that venire member Wright should have been removed for cause because of his overall bias. Specifically, defendant argues that Mr. Wright stated on a number of occasions that he could not consider many of the mitigating circumstances which the trial judge had instructed must be considered in the penalty phase. According to the defendant, under close examination he clearly stated that most mitigation was just an excuse. In denying defense counsel's challenge for cause, the trial court stated that though there may have been initial confusion as to mitigation, Mr. Wright had stated that he could follow the law.
Although Mr. Wright expressed a general pro-death penalty stance when initially questioned by the trial court during initial voir dire of the panel, he did not refuse to consider mitigating factors even though he viewed some mitigating factors as excuses. Review of the voir dire of the entire panel indicates a general confusion regarding the bifurcated nature of the trial for the guilt phase and the penalty phase. The court explained the procedure as follows:
COURT: This trial involves a bifurcatedit's a bifurcated trial. There's what they
 call the guilt phase. I'll instruct you on the law as to the guilt phase and
 that's going to be determining whether you find the individual guilty or
 not of the crime charged, or a lesser or responsive verdict, which I'll
 instruct you on the law so far as what those verdicts are. But I'll instruct
 you on the law that you are to apply to the facts, so far as guilt or
 innocence is concerned. And then I'll instruct you if you find the
 defendant guilty of first degree murderonly if you find him guilty of first
 degree murderthen I'll instruct you on the penalty phase. And that's
 when you get into whether or not the defendant is to be sentenced to
 death by lethal injection or life imprisonment.
 So in both cases, will you follow the law as I instruct you on the law?
WRIGHT: Well, I'd certainly try and I'm saying that with ayou know, it would be
 how I would feel morally with what you've given me to work with.
COURT: Okay.
*874 At one point when being questioned by the defense as to whether he would more than likely vote for the death penalty, Mr. Wright replied: "Well, I can't say that until I've heard everything. This is all supposition on our part you know, I can suppose a lot of things until I'm faced with it."
Following questioning by defense counsel, there was an exchange between defense counsel and Mr. Wright regarding whether an automatic death penalty was in effect for killing a policeman or fireman. An additional question involved whether there was a federal law regarding the death penalty for killing a narcotics agent.
This exchange prompted a bench conference during which the State and defense counsel agreed the entire panel was confused regarding mitigating circumstances and requested assistance from the court in explaining the matter. The court explained as follows:
COURT: Let's see if we can straighten up some confusion. There was a bench
 conference here and we'll attemptwe had a little law school session here.
 Mitigating circumstances that Mr. Nolting mentioned to you, those are
 circumstances that are only considered during the penalty phase. The
 reason being, during the penalty phase the State has to show aggravating
 circumstances or an aggravating circumstance in order to get the death
 penalty. That's during the penalty phase. The State has to show an
 aggravating circumstance in order to obtain or for you to determine
 whether or not the death penalty should be imposed. Now the defense
 brings up the mitigating circumstances, because if the State crosses that
 hurdle of proving an aggravating circumstances or aggravating circumstance
 to give you sufficient information or evidence as to the death
 penalty, then the defense wants to show mitigating circumstances to carry
 you to a lower level or level below that, that being life imprisonment,
 without benefit of probation, parole or suspension of sentence. So that's
 why mitigating circumstances come in. The State has to show that there
 was an aggravating circumstance in the commission of the crime. If they
 show that, then you're looking at death by lethal injection. Defense
 counsel, at that point, wishes to show the mitigating circumstances that
 they want you to consider in taking this from a death by lethal injection to
 life imprisonment. So the mitigating circumstances don't come into play
 during the guilt phase. The youth of the offender, whether he was under
 someone else's domination or control, that does not come into play until
 the penalty phase. Does that clear things up?
At this point following an interchange with another juror, the court again explained the procedure to be followed in a bifurcated trial. Defense followed with an explanation of mitigating factors concluding with the following.
DEFENSE: ... Mitigating circumstances are, like he said, they are not excuses to be
 used to justify an homicide. But the law requires you and it says you shall
 consider them in determining what the penalty is. Now does everyone
 understand that now [AS TO ALL JURORS]?
[GENERAL AFFIRMATIVE RESPONSE]
Finally, when the defense challenged prospective juror Wright for cause, the following exchange occurred:
*875
DEFENSE: Your Honor, we would challenge Mr. Wright for cause as well. I think his
 attitude toward mitigation is that mitigation was a fancy word for excuse;
 that if committed on first, that I'm for it, as far as the death penalty, and
 that basically he would give lip service to mitigation, but if they were
 found guilty of first degree murder, that he would not consider any other
 alternative except death.
COURT: Response?
STATE: I must have been in a different room, because I believe when Mr. Nolting
 was talking to him and the jury was obviously confused and you cleared up
 their confusion, this prospective juror said that he could consider every
 mitigating circumstance and that he would follow your instruction. And
 the law requires that they consider it, and the law requires that they
 follow your instruction.
COURT: The Court acknowledges that there was some initial confusion as to the
 mitigating circumstances, but after clearing that up, this particular juror
 did state that he would be able to follow the law so far as the mitigating
 circumstances are concerned, and the challenge for cause is denied.
The defense exercised a peremptory challenge excusing Mr. Wright.
Prejudice is presumed when a challenge for cause is denied erroneously by a trial court and the defendant has exhausted his peremptory challenges. An erroneous ruling depriving an accused of a peremptory challenge violates his substantial rights and constitutes reversible error. State v. Cross, 93-1189, p. 6 (La.6/30/95), 658 So.2d 683, 686; State v. Bourque, 622 So.2d 198, 225 (La.1993). A trial court is vested with broad discretion in ruling on challenges for cause, and these rulings will be reversed only when a review of the voir dire record as a whole reveals an abuse of discretion. State v. Cross, 93-1189, p. 7, 658 So.2d at 686; State v. Robertson, 92-2660 (La.1/14/94), 630 So.2d 1278, 1280. A trial judge's refusal to excuse a prospective juror for cause is not an abuse of his discretion notwithstanding that the juror has voiced an opinion seemingly prejudicial to the defense, when subsequently, on further inquiry or instruction, he has demonstrated a willingness and ability to decide the case impartially according to the law and evidence. Id., at 1281.
In the present case, defendant exhausted his peremptory challenges and thus the only issue before the court is whether the trial judge erred when it denied his challenge for cause. The proper standard for determining when a prospective juror may be excluded for cause because of his views on capital punishment is whether the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985); State v. Sullivan, 596 So.2d 177 (La.1992), rev'd. on other grounds sub nom; Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). The basis of the exclusion under LSA-C.Cr.P. art. 798(2)(a)(b), which incorporates the standard of Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), as clarified by Witt, is that the juror "views would `prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" In a "reverse-Witherspoon" context, the basis of the exclusion is that the juror "will not consider a life sentence and ... will automatically *876 vote for the death penalty under the factual circumstances of the case before him...." State v. Robertson, 630 So.2d at 1284[5]. If a prospective juror's inclination toward the death penalty would substantially impair the performance of the juror's duties, a challenge for cause is warranted. State v. Ross, 623 So.2d 643, 644 (La.1993).
Most recently, in State v. Chester, 97-2790 (La.12/1/98), 724 So.2d 1276, this court rejected the capital defendant's claim that the trial court erred when it denied his challenge for cause based on a prospective juror's inability to return a life sentence in case of intentional murder. In Chester, the court summarized the juror's responses during voir dire as follows:
Ms. Galloway responded to the state's questioning that she would listen to both the aggravating and mitigating circumstances and in an appropriate case return a life sentence. Later, when questioned by defense counsel, she replied that there was a contradiction between specific intent and mitigating circumstances. When defense counsel attempted to explain mitigating circumstances, she replied that she understood them; however, her responses indicated that she was confused about the application of mitigating circumstances in a specific intent crime because she thought mitigating circumstances could apply only when the crime was accidental. However, she also stated in her colloquy that she would listen to both mitigating and aggravating circumstances, and "make a judgment based on what is presented."
State v. Chester, 97-2790, pp. 14-15, 724 So.2d at 1285-86. The court concluded that based on her entire colloquy, it did not find the juror expressed "an unconditional willingness to impose a death penalty under any and all circumstances." Id. Accordingly, the court determined that the trial court did not abuse its discretion when it denied the cause challenge. Id.
The voir dire in Chester resembled that conducted in the instant case. Mr. Wright initially expressed the view that mitigating circumstances were merely excuses. He indicated he would consider them, but did not think it would change his mind. Following explanation by the court of mitigating circumstances and questions regarding whether he would consider the evidence presented and follow the law, Mr. Wright indicated he would.
Considering the broad discretion allowed the court as well as the juror's indication that he could follow the law, we conclude that under the rationale of Chester, Mr. Wright did not demonstrate "an unconditional willingness to impose a death penalty under any and all circumstances." State v. Chester, 97-2790, p. 15, 724 So.2d at 1285-86.
We find no error in the court's ruling. This assignment lacks merit.

*877 ARGUMENT NO. 4

(Assignment of Error No. 5)
In his fifth assignment of error, the defendant claims that venire member Allain should not have been struck for cause because of her views on the death penalty. Specifically, defendant claims that Ms. Allain was clear in stating that she could impose a sentence of death. However, the record reveals that Ms. Allain was unequivocally opposed to the death penalty.
COURT: Okay. Now, you stated in regards to the death penalty that you do not
 believe in it, that you believe in life imprisonment; is that a correct
 statement that you made?
ALLAIN: Yes, sir, it is.
COURT: Okay. Now, also you made a statement to the [e]ffect that you don't know
 how you would feel if it was a close family member. Well, what do you
 mean by that?
ALLAIN: I just mean that if it's something that happened to my family, I think my
 feelings would change in that order. But as far as my religion and as far
 as my beliefs, I feel like we're not thewe don't make that decision, that
 somebody else does.
Next, under questioning from the State, Ms. Allain again expressed her opposition to the death penalty:
STATE: I'm not going to try to pick on you. And you know what, these are our
 opinions, these are not right or wrong opinions. And it's perfectly
 acceptable to have feelings about this. Would you explain a little bit more
 how you feel about the death penalty?
ALLAIN: I just really feel that it's not our decision, even though the Bible says an
 eye for an eye, a tooth for a tooth. I just feel that we are forgetting God
 and we're put on this EarthI mean, I don't disagree with punishment,
 you know, and if someone come to me and killed my mother, I may would
 feel totally different, you know.
STATE: How do you reconcile with yourself?
ALLAIN: I don't know. I don't know.
STATE: It's weird, right?
ALLAIN: It's weird. It's weird. I mean I've never had anything happen to me or
 my family, you know, to have to make any type of decision to whatto
 wellthe was I really would feel, but I just feel that that's just not an
 option. To me, I think people should have life imprisonment, a chance to
 live. I don't agree with us making the decision, you have to die. I don't
STATE: No matter what, the defendant lives?
ALLAIN: Right.
STATE: Okay. Would you automatically vote against imposition of the death
 penalty based on those beliefs?
*878
ALLAIN: I don't know, it depends on the facts.
STATE: Okay, well the facts are your mother's not the victim here, right?
ALLAIN: Right.
STATE: And no one in your family is a victim here?
ALLAIN: I would have to say that I would vote against the death penalty.
STATE: Could you ever conceive of any circumstance where you, besides an
 immediate family member, could you?
ALLAIN: I don't know.
* * * *
STATE: Have you always believed against the death penalty?
ALLAIN:[6] Did you ever recently hear of a case in which the death penalty was
 imposed and you said I agree with that sentence?
ALLAIN: No.
* * * *
STATE: Okay. Is this based on a religious belief from your church or is this a
 personal belief?
ALLAIN: To an extent, to an extent, but it's more personal.
STATE: And how do you think you came to that?
ALLAIN: Just all my life, that's just the way I felt. I mean, we have a very close
 family and we're justI just was really raised that way. I mean, my
 mother wasit was a belief she taught me.
STATE: So you believe thisit's an ingrained traditional belief of your family and
 so you don't believe you could go against that belief under any circumstances,
 other than an immediate family member, of which you may
 reconsider your position?
ALLAIN: Right.
STATE: So if you're sitting in a room with these good people and they all want to
 impose the death
ALLAIN: That's all I'm saying right. I don't.
STATE: You would still hold to that belief?
ALLAIN: I think so.
*879 However, despite appellate counsel's argument to the contrary, even the defense's voir dire revealed Ms. Allain believed that the death penalty should not be imposed:
DEFENSE: You had indicated that under all circumstances, you couldn't vote for
 death; is that correct?
ALLAIN: Right.
DEFENSE: Unless it was someone close in you family?
ALLAIN: No, I said I've never been put in that position, and I could possibly vote
 for death. I'm against the death penalty and I would definitely consider
 all mitigation, as I feel that that's only fair.
DEFENSE: Okay.
ALLAIN: I feel like everyone should consider that. It all has a play in the verdict.
DEFENSE: Okay.
ALLAIN: It does not have a play in whether you're guilty or not, I agree.
DEFENSE: Right.
ALLAIN: But it has a play in whether the person deserves life in prison or the death
 penalty.
DEFENSE: All right. So you can honestly consider the aggravating circumstances,
 and under certain conditions, impose the death penalty. Is that not
 correct?
ALLAIN: Yes sir.
A defendant is guaranteed an impartial jury and a fair trial. LSA-Const. art. I, § 16; State v. Brown, 496 So.2d 261, 263 (La.1986); State v. Bell, 315 So.2d 307, 309 (La.1975). If a prospective juror's inclination toward the death penalty (or life imprisonment) would substantially impair the performance of the juror's duties, a challenge for cause is warranted. State v. Ross, 623 So.2d 643, 644 (La.1993). Venire member Allain candidly stated that she could not vote to impose the death penalty. Although she said she might be able to consider imposing the death penalty in the extraordinary case of one her own family members being murdered, she subsequently equivocated and stated that even in such a circumstance she was not sure she could vote for the death penalty. As such, her answers as a whole suggested that she might have been unable to render a judgment according to the law since she did not definitively state whether she could consider imposing a death sentence in this case. See State v. Jones, 474 So.2d 919, 928 (La.1985), cert. denied, 476 U.S. 1178, 106 S.Ct. 2906, 90 L.Ed.2d 992 (1986); see also State v. Nicholson, 437 So.2d 849, 854 (La.1983) (trial court properly excluded for cause juror who could return the death penalty only in the case of mass murderers such as Adolf Hitler or Charles Manson). Because her uncertainty likely would have prevented or substantially impaired her ability to make an impartial sentencing decision, see Wainwright v. Witt, the trial court properly granted the State's challenge for cause. Cf. State v. Tart, 93-0772, p. 15 (La.2/9/96), *880 672 So.2d 116, 124 (A challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice, or inability to render judgment according to law may be reasonably implied.). Accordingly, this assignment of error also lacks merit.

GUILT PHASE

ARGUMENT NO. 5

(Assignment of Error No. 3)
In his third assignment of error, the defendant complains that gruesome photographs used in his trial violated his constitutional rights. Specifically, defense counsel objected to State's exhibits 77, 78, and 79, all post-mortem autopsy photographs of Ms. Dupuis depicting the bullet wounds in her body. Counsel also objected to the introduction of State's exhibits 80, 81, and 82, all post-mortem autopsy photographs of Ms. Blanchard depicting each of the bullet wounds in her body.
The State is entitled to the moral force of its evidence, and post-mortem photographs of murder victims are admissible to prove corpus delicti, to corroborate other evidence establishing cause of death, as well as location and placement of wounds, and to provide positive identification of the victim. State v. Koon, 96-1208, p. 34 (La.5/20/97), 704 So.2d 756, 776 (orig.hrg); State v. Maxie, 93-2158 (La.4/10/95), 653 So.2d 526, 532 n. 8, citing State v. Martin, 93-0285, p. 14 (La.10/17/94), 645 So.2d 190, 198. Photographic evidence will be admitted unless it is so gruesome that it overwhelms jurors' reason and leads them to convict without sufficient other evidence. State v. Koon, 96-1208 at 34, 704 So.2d at 776, citing State v. Perry, 502 So.2d 543, 558-59 (La. 1986), cert. denied, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 156 (1987).
The six autopsy photographs were relevant to show the manner of death and the location of the bullet wounds on the victims' bodies. These photographs are not repetitive or cumulative and while these photographs were certainly unpleasant, they were not excessively gruesome. Cf. State v. Morris, 245 La. 175, 157 So.2d 728, 732 (1963).
Accordingly, the defendant fails to show that the photographs were clearly more prejudicial than probative and that this court should interfere in the trial court's exercise of its broad discretion to admit the evidence. This assignment is without merit.

PENALTY PHASE

ARGUMENT NO. 6

(Assignment of Error No. 6)
In his sixth assignment of error, the defendant argues that the death penalty is not appropriate in the instant case because the Eighth Amendment of the United States Constitution and Article I, Section 20 of the Louisiana constitution prohibit the execution of mentally retarded individuals. Defendant's brief was submitted prior to the United States Supreme Court's decision in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), which held that the execution of the mentally retarded violates the Eight Amendment's prohibition against cruel and unusual punishment. In a supplemental brief filed in response to a request by this court, defense counsel strenuously argues that the defendant is indeed mentally retarded and, consequently, the Atkins decision prohibits imposition of the death penalty in this case.
In State v. Williams, 01-1650 (La. 11/1/02), 831 So.2d 835, another decision rendered this date we stated:

*881 Defendant's case is governed by the recent decision from the United States Supreme Court, Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 2251-52, 153 L.Ed.2d 335 (2002). In Atkins, the Court held that executing mentally retarded offenders is excessive under the Eighth Amendment, which "`places a substantive restriction on the State's power to take the life.'" Atkins, 536 U.S. at ___, 122 S.Ct. at 2252 (quoting Ford v. Wainwright, 477 U.S. 399, 405, 106 S.Ct. 2595, 2605, 91 L.Ed.2d 335 (1986) (Eighth Amendment precludes execution of the insane.)).20 This court is bound by the decision of the United States Supreme Court in Atkins.

Atkins is based on the "evolving standards of decency" that have occurred since the 13-year-old decision in Penry v. Lynaugh, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), allowed execution of a mentally retarded defendant. The Court noted that during the interim between Atkins and Penry, the practice of executing mentally retarded persons had become truly unusual. Thus, the Court found a national consensus had developed against such executions. Construing the Eighth Amendment in light of this documented evolution, the Court concluded execution of the mentally retarded was excessive and thus constitutionally barred. The Court reasoned that the mentally retarded, while not exempt from criminal sanctions, have diminished personal culpability. Further, mentally retarded defendants as a whole face a special risk of wrongful execution. Thus, the 13-year-old Penry precedent of allowing execution of a mentally retarded defendant is now a relic of the past.21
In Atkins, while extending Eighth Amendment protection to the mentally retarded, the United States Supreme Court left the imposition of the new rule to the states:
As was our approach in Ford v. Wainwright, with regard to insanity, "we leave to the States the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences." 477 U.S. 399, 405, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986).
Atkins, 536 U.S. at ___, 122 S.Ct. at 2250.
Although the United States Supreme Court left the task of developing appropriate ways to enforce the constitutional restriction against execution of the mentally retarded to the states, the Court provided guidance in some areas. The Court adopted a "clinical definition" of mental retardation which requires not only sub-average intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction which became manifest before the age of 18. Id., ___ U.S. ___, 122 S.Ct. at 2250, 153 L.Ed.2d 335. This definition is based on the definition developed by the American Association of Mental Retardation (AAMR)22 and is the definition utilized by the federal government23 and in some form by most of the states that have statutes prohibiting the execution of the mentally retarded.24 It also closely follows the definition in AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 41 (4th ed.2000).25
The Supreme Court acknowledged "there is serious disagreement about ... determining which offenders are in fact retarded." Atkins, 536 U.S. at ___, 122 S.Ct. at 2250. Realistically, the Court noted that not all persons who claim to *882 be mentally retarded will be so impaired as to fall within the group entitled to the Atkins prohibition against the death penalty. Noting that state statutory definitions of mental retardation are not identical, but are generally in conformity with the definitions cited in Atkins, the Court, nonetheless, left to the states the task of developing appropriate ways to determine which offenders will be spared the death penalty because of mental retardation.
20. The issue of whether execution of a mentally retarded person is barred by the Eighth Amendment and by the Louisiana Constitution has been raised by several defendants. See State v. Comeaux, 93-2729 (La.7/1/97), 699 So.2d 16, and cases cited therein. Those cases, however, were decided prior to the United States Supreme Court's pronouncement of a bar to such application of the death penalty in Atkins.

21. The mandate of Atkins that the State may not execute a mentally retarded person is retroactive to any case, at any stage of the proceedings, including the instant case, in which the defendant is facing the prospect of capital punishment. See State v. Sanders, 523 So.2d 209 (La.1988), a case in which this court held new constitutional rules for the conduct of criminal trials will be given limited retroactive effect to all cases pending on direct review or still subject to direct review, unless the new rule is designed to overcome an aspect of the proceedings that impaired its truth-finding function; in the latter cases, the new rule will be given full retroactive effect. See also Penry, 492 U.S. at 330, 109 S.Ct. at 2953, ("[I]f we held, as a substantive matter, that the Eighth Amendment prohibits the execution of mentally retarded persons such as Penry regardless of the procedures followed, such a rule would fall under the first exception to the general rule of non-retroactivity and would be applicable to defendants on collateral review.").
22. "Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18." Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed.1992).
Atkins, 536 U.S. at ___, 122 S.Ct. at 2245 n. 3.
Although the Court used the AAMR's definition in MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS (9th ed.1992), we note that MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS (10th ed.), was published in 2002 shortly before the release of Atkins. Thus, MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS (10th ed.2002) presumably was not available to the Court during briefing and argument stages of the litigation. The AAMR's 2002 definition is: "Mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical skills. This disability originates before age 18." MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 1 (10th ed.2002).
The definition of mental retardation has been in a state of flux for over 65 years, evidenced by the definitions dating from Tredgold (1908, 1937) and Doll (1941, 1947) to the current AAMR 10th Edition definition. MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 19 (10th ed.2002).
23. 18 U.S.C.A. § 3596(c).
24. Ariz.Rev.Stat. Set. 13-3982; Ark.Code Ann. Sect. 5-4-618 (1993); Colo.Rev.Stat. Sec. 16-9-401-403; Conn. Gen.Stat. § 53a-46a; Fla. Stat. Ann. § 921.137; Ga.Code. Ann. § 17-7-131(i); Ind.Code § 35-36-9-1; Kan. Stat. Ann. § 21-4623; Ky.Rev.Stat. § 532.120-140; Md. Cod. Ann. art. 27 § 412; Mo.Rev.Stat. 565.030; N.M. State. Ann. § 31-20A-2.1; Neb.Rev.Stat. § 28-105.1; N.Y.Crim. Proc. Law § 400.27; 2001 N.C. Sess. Laws 346; S.D. Codified Laws § 23A-27A-26.1; Tenn.Code Ann. § 39-13-203; Wash. Rev.Code. § 10.95.030.
25. "The essential feature of Mental Retardation is significantly sub-average general intellectual functioning that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal *883 skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety. The onset must occur before age 18 years. Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed.2000).
"Mild" mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70. Id., at 42-43.

Atkins, 536 U.S. at ___, 122 S.Ct. at 2245 n. 3.
State v. Williams, 01-1650 at 20-22, 831 So.2d at 851-53.
Not everyone who alleges mental retardation will be entitled to a hearing following the decision of the Supreme Court in Atkins. One who claims mental retardation so as to avoid the consequences of his actions must be carefully evaluated. According to the United States Supreme Court, those who are in fact mentally retarded must be spared the death penalty, but otherwise can be punished for their criminal acts. Those who are not mentally retarded should face the full consequences of their criminal acts. It would be a perversion of our criminal justice system if those who are not mentally retarded could escape the full consequences of their acts by merely claiming to be mentally retarded. This court is not prepared to order that everyone sentenced to death is entitled to a hearing to determine whether or not they are mentally retarded. Rather, that determination must be made on a case by case basis applying the criteria established by this court in Williams.
In Williams, we instructed the trial court to treat the issue procedurally like a pretrial competency hearing. See LSA-C.Cr.P. art 641 et seq. The procedure should be appropriately modified to address assessment of mental retardation. For instance, when an evidentiary hearing is requested to decide whether a defendant faced with a capital sentence is mentally retarded, the courts should use the standard provided by statute for determining when a pre-trial competency hearing is necessary. See LSA-C.Cr.P. art. 643 ("The court shall order a mental examination of the defendant when it has reasonable ground to doubt the defendant's mental capacity to proceed."); see also, LSA-C.Cr.P. art. 643, cmt. (a) ("It is not enough that the defense has filed a motion urging the defense [of mental incapacity to proceed], but there must be sufficient evidence to raise a reasonable doubt as to such capacity."). Article 643 establishes a standard that a defendant must meet by coming forward with some evidence to put his mental condition at issue. For a discussion of LSA-C.Cr.P.art. 641 et seq. and the jurisprudence that applies to these procedures, see State ex rel. Seals v. State, 00-2738 (La.10/25/02), 831 So.2d 828.
As stated in Williams:
For example, LSA-C.Cr.P. art. 644 governs the appointment of a sanity commission and the examination of the defendant. In pertinent part, LSA-C.Cr.P. art. 644(A) provides:
Within seven days after a mental examination is ordered, the court shall appoint a sanity commission to examine and report upon the mental condition of the defendant. The sanity commission shall consist of at least two and not more than three physicians who are licensed to practice medicine in Louisiana.
We note that instead of physicians, experts with the appropriate expertise to diagnose mental retardation shall be utilized. In cases in which there must be a remand based on Atkins, this procedure will allow for court-appointed experts to examine the defendant and determine *884 if indeed he meets the criteria for mental retardation established in LSA-R.S. 23:381. In addition, LSA-C.Cr.P. art. 646 also gives the State and the defendant the right to an independent mental examination by an expert of their choice, a procedure which would also be beneficial in these matters. However, the trial court must not rely so extensively upon this expert testimony as to commit the ultimate decision of mental retardation to the experts. See State v. Snyder, 98-1078, p. 26 (La.4/14/99), 750 So.2d 832, 852, citing State v. Bennett, 345 So.2d 1129, 1137 (La.1977).
The code also provides for a contradictory hearing, with LSA-C.Cr.P. art. 647 stating:
The issue of the defendant's mental capacity to proceed [or in this case, the issue of whether or not the defendant is mentally retarded under applicable standards] shall be determined by the court in a contradictory hearing. The report of the sanity commission is admissible in evidence at the hearing, and members of the sanity commission may be called as witnesses by the court, the defense, or the district attorney. Regardless of who calls them as witnesses, the members of the commission are subject to cross-examination by the defense, by the district attorney, and by the court. Other evidence pertaining to the defendant's mental capacity to proceed may be introduced at the hearing by the defense and by the district attorney.
State v. Williams, 01-1650 at 30, 831 So.2d at 859.
In summary, the defendant has the burden to come forward with some evidence to put his mental condition at issue. If the court has reasonable ground to doubt whether the defendant is mentally retarded, then the trial court shall order a mental examination of the defendant in conformity with the instructions provided by this court in Williams. Defendant has the burden of establishing his mental retardation by a preponderance of evidence at a hearing before the trial court as opposed to a jury. See State v. Williams, 01-1650 at 29-33, 831 So.2d at 858-61.
In this matter Dr. Marc Zimmerman, a forensic psychologist, qualified as an expert in that field after the State stipulated to his expertise. He testified that Dunn is "mildly mentally retarded and that he has a pervasive pattern of brain dysfunction." Dr. Zimmerman, the only expert who did a clinical evaluation of Dunn, met with him a total of four times to administer the tests used for evaluation. His testimony indicated Dunn has a full scale IQ of 71 based on the Kaufman Adolescent and Adult Intelligence Test. Dr. Zimmerman admitted he did not view the video of the crime as it was unfolding, nor did he review the police report of the incident. He testified that Dunn has a lack of impulse control and is a slow learner who is able to perform well in a structured environment, but cannot perform in a rational manner in a chaotic situation. Although it was his opinion that Dunn is mentally retarded, we note Dr. Zimmerman's testimony did not adequately focus on the developmental period of Dunn's lifea critical time period for determining whether one is mentally retarded. The Louisiana statutory provision indicates a developmental disability attributable to mental retardation is manifested before the person reaches age 22. See LSA-R.S. 28:381(12). We also note that Dr. Zimmerman's diagnosis was not challenged with questions regarding evidence of Dunn's work history or educational achievements.
*885 Over State's objection, the court accepted Ms. Patricia M. Percy as an expert in the field of forensic social work, indicating the jury could determine the weight to be given her testimony. She classified defendant as having borderline intellectual functioning. She testified his cumulative school records from East St. John High School could not be located and were thus unavailable for review. Ms. Percy had available some of Dunn's report cards, supplied by his family, which indicate that although he did not do well in school there were no attendance problems. In spite of the fact that he did not do well in school and failed the 9th grade, he had never been identified as a child who was a slow learner. She testified that Dunn, the third of four children, did not have an alcohol or substance abuse problem.
Review of Ms. Percy's testimony does not support the State's contention that she testified that Dunn was not mentally retarded. Rather, her testimony indicates she deferred to Dr. Zimmerman on that issue. A fair reading of her testimony also establishes she testified although an IQ of 70 is generally considered the upper level for determining mental retardation, IQ standing alone cannot be used to determine whether one is mentally retarded. Nevertheless, the determination of whether Dunn is mentally retarded was not within the purview of her evaluation. There is no evidence to indicate she administered any tests to Dunn.
Dr. Sara DeLand qualified as an expert in the field of forensic psychiatry. She is employed by Tulane University in the division of forensic psychiatry and provided contract services to the State Department of Corrections through Tulane. She did not formally diagnose Dunn as mentally retarded, nor did she administer any test to him as she was not called upon to make that diagnosis. She testified that he was "significantly intellectually limitedon the high end of mild mental retardation." A fair reading of her testimony indicates she did not rule out that he was mentally retarded indicating, "[H]e's right on the edge."
The defense contends Dr. Zimmerman's uncontradicted expert testimony established the defendant was mentally retarded; therefore, this court should apply Atkins to exempt him from the death penalty. Contradictorily, the State urges this court to reject Dr. Zimmerman's testimony because of anecdotal evidence which established the defendant is not mentally retarded because of his adaptive skills. However, given the sparse record on this issue, this court cannot decide whether Dunn is mentally retarded. We are not suggesting this anecdotal evidence may not be relevantrather this court cannot use that evidence to make a diagnosis on this record. The State never questioned Dr. Zimmerman regarding the relevance of many of the matters which the State now asserts establishes the defendant is not mentally retarded. We are not suggesting a deficiency in the manner the State questioned the witness; however, we note that an issue that was marginally relevant at the time of the trial became significantly relevant and an ultimate issue following the trial as a result of the United States Supreme Court's decision in Atkins.
Additionally, the State argues the simple fact that the jury imposed the death sentence reflects a finding that Dunn was not mentally retarded. This argument lacks merit because prior to the Atkins decision, execution of mentally retarded individuals was permissible. Furthermore, we have determined that the issue of whether or not one is mentally retarded is to be determined by the court, not by a jury. See *886 State v. Williams, 01-1650 at 32-33, 831 So.2d at 861.
The United States Supreme Court essentially altered the rules and altered a relevant fact after the trial. The State and the defense are both put in the impossible position of arguing whether a fact was establishedi.e., whether the defendant is mentally retardedwhen that fact was simply not an issue which a fact finder was called upon to decide. A fact that was marginally relevant when this case was tried (whether the defendant is mentally retarded) became a fact which could determine the sentence to be imposed after the trial. The State and defense gallantly attempt to argue from this record; however, their efforts must fail because the significance of the issue of mental retardation was drastically changed after the trial as a result of Atkins. The relevance of whether or not this defendant is mentally retarded has increased exponentially. Neither the State nor defense was required to anticipate this change.
The defense was not called upon to exert time, energy, and effort in marshaling proof of mental retardation at the trial. Defendant needed only to establish diminished capacity as a mitigating factor.[7] There was no obligation to prove mental retardation, which after the trial became a bar to the death penalty. Nevertheless, although the defendant was not called upon to offer proof of mental retardation, the defendant did offer evidence of mental retardation.
It would be patently unjust to conclude from this record that the defendant failed to prove a fact which the defense was not called upon to prove at the time of the trial. Because the burden of proof of establishing mental retardation is imposed on the defendant,[8] the defendant must be afforded the opportunity to meet that burden in a case such as this in which an expert testified without contradiction Dunn is mentally retarded and his IQ is very close to that which would indicate mental retardation.[9] We reiterate that a defendant *887 is not entitled to a post-Atkins hearing regarding mental retardation merely upon request.
Furthermore, neither the State nor the defendant had any guidance as to the proper definition, criteria, and procedure to utilize in determining when one is mentally retarded such that the death penalty could not be imposed. Based on the record in this case, this court lacks sufficient factual evidence to make the legal determination of whether or not the defendant is mentally retarded. This factual/legal determination must be made following a hearing during which the court will be guided by evaluation and diagnosis made by those with expertise in diagnosing mental retardation.
Because the record contains sufficient evidence in the form of Dr. Zimmerman's uncontradicted expert opinion, there exists reasonable ground to doubt whether defendant is mentally retarded. Thus, the Supreme Court opinion in Atkins mandates that the issue of Dunn's mental retardation be resolved. In light of Atkins and testimony of Dr. Zimmerman who clearly and without contradiction testified Dunn is mentally retarded, this court is obligated to follow the dictates of the United States Supreme Court and remand for a hearing on the issue of whether or not Dunn is in fact mentally retarded.
Concepts of judicial economy dictate that the issue of whether Dunn is mentally retarded be resolved now. Without a resolution of this issue at a hearing, this matter could linger in the court system far too long. This court is not insensitive to a need for closure and resolution for all involved. However, a change in the law by the United States Supreme Court after this case was tried dictates the necessity to remand.
Our decision to remand for a hearing should in no manner be construed as a determination that Dunn is mentally retarded. That issue must be resolved at a hearing before the trial court. Although Dr. Zimmerman testified without contradiction that Dunn is mentally retarded, there are other factors which may well establish that he is not. The record contains evidence that he received college credit for courses completed during his incarceration. Additionally, upon his release from prison he was successfully employed for a period of time of approximately 18 months before being laid off with a recommendation for rehire should market conditions change.[10]
This matter is remanded to the district court to conduct a hearing in conformity with the procedure outlined in this case. We retain jurisdiction for review of the *888 penalty in the event defendant is not determined to be mentally retarded.[11]

MISCELLANEOUS

ARGUMENT NO. 7

(Assignment of Error 1(A))
In his first assignment of error, defendant argues that the cumulation of error in this case mandates that the court grant him a new trial and sentencing hearing. As to this argument, "the combined effect of the incidences complained of, none of which amounts to reversible error, did not deprive the defendant of his right to a fair trial." State v. Copeland, 530 So.2d 526, 544-45 (La.1988) (citing State v. Graham, 422 So.2d 123, 137 (La.1982)); State v. Sheppard, 350 So.2d 615, 651 (La. 1977). This argument is without merit.

DECREE
For the reasons assigned, we affirm the defendant's conviction for the murders of Lisa Dupuis and Jacqueline Guillot Blanchard. We pretermit review of the penalty phase of defendant's trial and remand to the district court for a hearing in conformity with this opinion to determine whether or not defendant is mentally retarded.
CONVICTION AFFIRMED. CASE REMANDED FOR EVIDENTIARY HEARING CONSISTENT WITH THIS OPINION TO DETERMINE WHETHER DEFENDANT IS MENTALLY RETARDED.
VICTORY, J., concurs in part and dissents in part with reasons.
VICTORY, J., concurring in part and dissenting in part.
For the reasons given today in my partial concurrence and dissent in State v. Williams, 01-KA-1650 (La.11/1/02), 831 So.2d 835, 861-62, I respectfully concur in part and dissent in part.
NOTES
[1] Although the crime took place in Assumption Parish, the trial court granted the defendant's motion for a change of venue as to selection of the jury only. Thus, the jury was selected in Calcasieu Parish, but the trial was conducted in Assumption Parish.
[2] See State v. Williams, 01-1650 n. 2 (La. 11/1/02), 831 So.2d 835, regarding the use of the term "mental retardation" and the AMERICAN ASSOCIATION ON MENTAL RETARDATION (AAMR), MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS (10th ed.2002) text at page xii which notes although there is dissatisfaction with the term, no satisfactory substitute has been developed.
[3] Although trial counsel did not specifically refer to this portion of the Code of Evidence when making his argument to the trial court, he stated that:

We were going to ask for this Motion in Limine alsoto see where the line will be drawn as to whether or not Kendall Breaux's statements to police were consistent with what was on the tape. That's all... And that was the extent of our mentioning of Kendall Breaux or Anthony Scott, because both of them, as you recallwell you don't recall because you didn't see any of the evidenceKendall Breaux made statements that totally fly in the face of what we see on TV. And I'm not going to ask specifics of anyone of what he said, but I will ask whether or not the actions that we see him perform on the tape, on the bank video cameraare consistent with what he told them.... Once again, my question would be limited to, were his statements consistent with what is shown on the video tape. As far as Kendall Breaux's coming and seeking out James Dunn, I will introduce that through testimony from credible witnesses.
[4] We make no ruling whether this alleged evidence may have other independent relevance, if properly introduced, at the hearing ordered in this matter regarding retardation.
[5] The "substantial impairment" standard also applies to the reverse-Witherspoon challenges. In Morgan v. Illinois, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), the Supreme Court held that venire members who would automatically vote for the death penalty must be excluded for cause. The Court reasoned that any prospective juror automatically voting for death would fail to consider the evidence of the aggravating and mitigating circumstances, thus violating the impartiality requirement of the Due Process Clause. Id., 112 S.Ct. at 2229. The Morgan Court adopted the Witt standard for determining if a pro-death juror should be excused for cause. In other words, if the juror's views on the death penalty are such that they would "prevent or substantially impair the performance of their duties in accordance with their instructions of their oaths," whether those views are for or against the death penalty, he or she would be excused for cause.
[6] Although the statement in the record is attributed to Ms. Allain, it is obvious from reading the transcript that the State asked a second question prior to an answer by the prospective juror.
[7] See LSA-C.C.r.P. art. 905.5(c).
[8] The defendant bears the burden of proving he is mentally retarded by a preponderance of the evidence. See State v. Williams, 01-1650 at 31-33, 831 So.2d at 859-61.
[9] The Louisiana statutory provisions defining mental retardation specify that "significantly subaverage" intellectual functioning is two standard deviations below the mean for the test of intellectual functioning. LSA-R.S. 28:381(42). As stated in MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS (10th ed.2002), a text of the AAMR, the mean is 100. Depending on the IQ test administered, two deviations below the mean is an IQ of 70 on the Wechsler scale and an IQ of 68 on the Stanford Binet scale. See State v. Williams, 01-1650 at n. 25, 831 So.2d at 853; see also, AAMR text at p. 57.

Regardless of the test administered, each test is burdened with a range of plus/minus number of IQ points known as the standard error of measurement (SEM). For example, an SEM of 4 would indicate one with an IQ score of 71 could have an IQ between 67 and 75. Most definitions of mental retardation indicate "approximately" an IQ of 70 as the upper IQ cut off. Although Louisiana's definition of significantly subaverage intellectual functioning does not specifically use the word "approximately," because of the SEM any IQ test score has a margin of error and is only a factor in assessing mental retardation. We also note that prison records indicate Dunn had an "estimated IQ of 76". Dr. DeLand testified because the Department of Corrections records reflect an estimated IQ "you can assume that they did not do the formal IQ testing, just because that's the way that it's reported."
According to Dr. Zimmerman, Dunn scored a 79 on his crystallized scales, a 65 on his fluid scales, and a full scale IQ of 71 on the Kaufman Adolescent and Adult Intelligence Test, a test which is not discussed in MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS (10th ed.2002). According to ALAN S. KAUFMAN AND NADINE L. KAUFMAN, MANUEL FOR THE KAUFMAN ADOLESCENT AND ADULT INTELLIGENCE TEST 83 (American Guidance Service 1993), the SEM for someone of Dunn's age tested on the Kaufman test is 2.6.
We note that common sense dictates an individual's motivation at the time of testing is a factor to be considered when assessing test results. Furthermore, not all individuals with a low IQ are mentally retarded. One with a low IQ could be intellectually limited, but not mentally retarded. Louisiana's definition of mental retardation includes a requirement that there be a severe chronic disability of a person attributable to mental retardation, manifested before age 22, likely to continue indefinitely, and resulting in substantial functional limitations in three or more of major life activities. See LSA-R.S. 28:381(12). Thus mental retardation requires a low IQ combined with limitations in adaptive skills in three or more "areas of major life activity [such as] self-care, understanding and use of language, learning, mobility, self-direction, and capacity for independent living." See LSA-R.S. 28:381(12).
[10] The record is devoid of evidence establishing the content of the courses he completed and devoid of evidence regarding his job responsibilities.
[11] If the trial court determines defendant is mentally retarded and the State chooses to appeal that determination, this court remains the proper forum for that appeal. See LSA-C.Cr.P. art. 913; State v. Langley, 95-1489, p. 2 n. 1 (La.4/3/02), 813 So.2d 356, 359 n. 1.